# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
POND, ARGUELLES[1], and JUETTEN
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Private First Class DONTE M. BROWN**
**United States Army, Appellant**

ARMY 20230168

Headquarters, Fort Riley
Steven C. Henricks, Military Judge
Lieutenant Colonel Jesse T. Greene, Staff Judge Advocate

For Appellant: Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Robert D. Luyties, JA (on brief); Lieutenant Colonel Autumn R. Porter, JA; Major Robert D. Luyties, JA (on reply brief).

For Appellee: Colonel Richard E. Gorini, JA; Major Marc B. Sawyer, JA (on brief).

9 May 2025

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ARGUELLES, Judge:

An enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of domestic violence upon his spouse in violation of Article 128b, Uniform Code of Military Justice, 10 U.S.C. §§ 928b (2019) [UCMJ]. The military judge subsequently dismissed Specification 2 after finding it unreasonably multiplied with Specification 1.

The military judge sentenced appellant to a dishonorable discharge, confinement for forty months, and reduction to the grade of E-1. The convening

------
[1] Judge ARGUELLEs decided this case while on active duty.

authority approved appellant's request for a waiver of automatic forfeitures but otherwise took no action on the sentence.

This case is before the court for review pursuant to Article 66, UCMJ. Appellant raises three assignments of error, two of which merit discussion but no relief.[2]

## BACKGROUND

The victim testified that on Saturday, 2 July 2022, she was supposed to run errands with her kids and husband/appellant, but that he was in a bad mood because he had just found out unexpectedly that he needed to deploy for a field exercise. The victim and appellant were arguing in the bedroom around midday when the victim attempted to end the argument by telling appellant, "I'm getting ready to go."

The victim had a concealed carry permit and routinely carried her handgun with her while working as a DoorDash delivery driver. The victim knew she could not carry her firearm while loaded on post, so she retrieved the gun from the top drawer of her dresser and turned away from appellant to clear the weapon by dropping the magazine and one round on the bed. The victim testified appellant then told her, "you should have kept those bullets in the gun because you're going to have to shoot me," to which the victim replied, "I don't want to shoot you. I don't want to harm you. I don't even want to argue with you right now." The victim then heard appellant grab a knife off the top of the dresser and felt him stab her in the side for the first time. Per the victim, after she tried backing away, appellant again stabbed her in the left shoulder, after which both parties struggled into the hallway and down the stairs. The victim testified that she woke up on the floor at the bottom of the stairs with appellant strangling her and saying "look what you made me do." On cross-examination, the victim denied that she "pointed a gun at him intentionally during a heated argument."

Appellant did not testify at trial, but his interview with an Army Criminal Investigation Division [CID] agent was admitted into evidence. Per appellant, after he confronted the victim about sending pictures of herself to another man, she pointed her gun at his face and he froze, telling her to "shoot me." Appellant claimed that he took advantage of the moment when the victim looked away from him to grab a knife off the dresser and stab her in self-defense. Appellant also admitted, however, that the gun was already on the bed and that he "thinks" the

---

[2] We have also considered the third assignment of error (factual insufficiency), as well as the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

victim had dropped the magazine when he stabbed her. Appellant stated that in the ensuing struggle, the knife accidentally lodged in the victim's shoulder as they were falling down the stairs.

## LAW AND DISCUSSION

### A. Denial of Defense Expert

### 1. Additional Facts

Prior to trial, appellant filed a motion seeking to compel production of an expert witness in forensic psychiatry.[3] Per appellant, the purpose of this expert was to explain the mental, psychological, neurological, and hormonal changes that occur in the "fight or flight" response to a lethal threat and how those changes distort an individual's cognitive ability to perceive and respond to threats. Appellant proffered that such testimony was relevant to establish and articulate the merits of his self-defense claim.

At the Article 39(a) motions hearing, the expert testified about the physiological and neurological changes in the body caused by the "fight or flight" response. Although the defense of self-defense has objective and subjective prongs, at the hearing defense counsel made it clear that appellant was only seeking expert testimony on the second subjective prong. When further questioned by the military judge, counsel also confirmed that the defense was "in no way raising *any type* of lack of mental responsibility or infirmity."

---

[3] Although entitled "Defense Motion for Appropriate Relief – Compel Expert Witness Production – RCM 906(b)(7) and 703(d)(2)(A)," the relief sought requested the court to "compel *the appointment* and production of defense forensic psychiatrist expert witness." The term 'appointment' typically refers to the appointment of expert consultant, which requires a distinct test from the test applied to a request for an expert witness, and the two tests are often intermingled and confused. *See, e.g. United States v. McGuiness*, ARMY 20071204, 2010 CCA LEXIS 96, at *12 (Army Ct. Crim. App. 19 Aug. 2010) (mem. op.) ("The defense request and the military judge's ruling both blur the distinction between a request for expert assistance and a request for an expert witness to provide testimony at trial."); *United States v. Olahprado*, ARMY 20220200, 2024 CCA LEXIS 170 at *18 (Army Ct. Crim. App. 9 Apr. 2024) (mem. op.) (holding that "a motion [to compel expert assistance] is almost always a precursor for introducing expert testimony at trial"). As the military judge and the parties, however, treated the motion only as a request for an expert witness, we will do the same.

Focusing on the physiological changes of the fight or flight response, the military judge denied the motion: "Instead, self-defense focuses on events external to an accused's body when a trier-of-fact considers the subjective and objective prongs of that defense, not whether an event would likely cause increased respiration, heart rate[,] and similar physical responses within the accused's body." In his written ruling, the military judge also found that Military Rule of Evidence [Mil. R. Evid.] 403 precluded such testimony. Although he did not mention it in his written ruling, during oral argument at the motions hearing, the military judge also questioned the relevance of this testimony and how it might aid the factfinder. The judge posed a hypothetical, asking how if someone pointed a gun at his face, "[d]oesn't everyone understand in that situation that I have a right to defend myself, assuming it's not the police or someone that pointed that gun at my face?"

Relying primarily on Rules for Courts-Martial [R.C.M.] 916(e)(1) and 916(k)(2), as well as a number of non-military cases from other federal and state jurisdictions, appellant now argues that the military judge erred in failing to consider the expert's testimony on how the fight or flight response would impact his state of mind and cognitive ability.

*2. Law*

In *United States v. Houser*, the CMA set forth six factors a proponent must establish in order to have an expert testify: (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and, (6) whether the evidence passes the Mil. R. Evid. 403 balancing test. 36 M.J. 392, 397 (C.M.A. 1993).

Rule for Courts-Martial 916(e)(1) provides that for assault cases involving deadly force, for self-defense to apply an accused must: (1) have objectively reasonable grounds to apprehend that death or grievous bodily harm is about to be inflicted; and (2) subjectively believe that the force used is necessary for protection against death or grievous bodily harm. The discussion notes following this rule note that because the first test is objective, the emotional instability of the accused is irrelevant. On the other hand, because the second test is entirely subjective, the notes provide that "such matters as the accused's emotional control, education, and intelligence are relevant in determining the accused's actual belief as to the force necessary to repel the attack."

Rule for Courts-Martial 916(k)(2) states only that a mental condition not amounting to a lack of mental responsibility is not an affirmative defense. The discussion following this rule provides, however, that evidence of a mental condition not amounting to lack of mental responsibility may still be admissible to determine whether the accused had the requisite state of mind in a specific intent case.

Finally, we review a military judge's decision regarding the admissibility of expert testimony for abuse of discretion. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014); *United States v. Bell*, 72 M.J. 543, 552 (Army Ct. Crim. App. 2013) (citing *United States v. Griffin*, 50 M.J. 278, 284 (C.A.A.F. 1999)).

### 3. Analysis

Appellant's primary challenge to the military judge's ruling is based on the discussion note following R.C.M. 916(e)(1), which states that because the second prong of self-defense is entirely subjective, "such matters as the accused's emotional control, education, and intelligence are relevant in determining the accused's actual belief as to the force necessary to repel the attack." Specifically, appellant claims that the military judge only focused on the physical responses associated with the fight or flight response and ignored the fact that his expert would also testify about how such a reaction impacts a person's mental and emotional state.

The vast majority of cases cited by appellant, almost all of which are from non-military jurisdictions, involve battered woman's syndrome (BWS), in which the self-defense expert explains *counter-intuitive* behavior. Moreover, the few cases cited by appellant not involving BWS pertain to an expert offering testimony about how a specific atypical condition suffered by the accused impacted his or her mental state. Indeed, when asked at the Article 39(a) motions hearing if he could cite a single case wherein an expert was allowed to explain how the flight or fight response impacts self-defense, defense counsel admitted he could not. Not surprisingly, on appeal appellant still cannot point to any such authority.

First, the military judge was correct that physiological changes, such as increased heart rate and breathing, are not directly relevant to appellant's "emotional control" in the context of self-defense. The military judge's reasoning expressed at the motions hearing that the factfinder does not need an expert to explain the basic "fight or flight" response was also not an abuse of discretion. Put another way, unlike BWS, there is nothing counter-intuitive about the fight or flight response, and having an expert explain the physical mechanisms behind such a reaction is not particularly relevant or helpful to the factfinder. *See United States v. Green*, 55 M.J. 76, 80 (C.A.A.F. 2001) (holding the military judge has broad discretion to determine whether the party offering the expert testimony has established an adequate foundation with respect to relevance).

Just because the discussion following R.C.M. 916(e)(1) states that evidence of an accused's emotional state can be relevant to the subjective prong of the self-defense test, that does not automatically mean that expert testimony is necessary on that issue. Indeed, the military judge did not preclude appellant from otherwise offering evidence of how his fight or flight response impacted his perception of the events. Nor was his counsel precluded from making any such arguments.

Appellant also argues for the first time on appeal that the military judge erred in not taking into consideration R.C.M. 916(k)(2), which he claims stands for the proposition that "state of mind" evidence is always relevant to a crime involving specific intent. We reject this argument for three reasons: (1) appellant did not raise it before the military judge below; (2) appellant's skewed interpretation of R.C.M. 916(k)(2) is incorrect; and (3) appellant expressly waived this argument at trial.

First, because appellant did not argue below that state of mind evidence was admissible under R.C.M. 916(k)(2) in support of his motion to compel the expert, we decline to consider this argument for the first time on appeal. *See Lloyd*, 69 M.J. at 100–01 ("We find that the military judge did not abuse her discretion by failing to adopt a theory that was not presented in the motion at the trial level."); *United States v. Carpenter,* 77 M.J. 285, 289 (C.A.A.F. 2018) ("[O]ur review for error is properly based on a military judge's disposition of the motion submitted to him or her—not on the motion that *appellate* defense counsel now wishes *trial* defense counsel had submitted.") (emphasis in original).

More fundamentally, and contrary to what appellant is now claiming, RCM 916(k)(2) is limited to evidence of a mental condition not amounting to a lack of mental responsibility and does *not* make admissible any and all "state of mind" evidence for a specific intent crime. First, R.C.M. 916(k)(1) provides that:

> It is an affirmative defense to any offense that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his or her acts. Mental disease or defect does not otherwise constitute a defense.

In its entirety, R.C.M. 916(k)(2) states that "[a] mental condition not amounting to a lack of mental responsibility under paragraph (k)(1) of this rule is not an affirmative defense." The discussion notes following this rule state that "[e]vidence of a mental condition not amounting to a lack of mental responsibility may be admissible as to whether the accused entertained a state of mind necessary to be proven as an element of the offense."

Accordingly, the discussion following R.C.M. 916(k)(2) does not open the door to any and all "state of mind" evidence in a specific intent case, but rather only narrowly applies to evidence of an appellant's "diminished capacity." *See United States v. Axelson*, 65 M.J. 501, 514 (C.A.A.F. 2007) (holding that although partial mental responsibility or "diminished capacity" is not an affirmative defense, under R.C.M. 916(k)(2) it can still be offered to negate a required *mens rea* element of an offense). Here, appellant did *not* offer any evidence of diminished capacity or partial mental responsibility at trial. To the contrary, his counsel expressly told the

military judge that the defense was "in no way raising *any type* of lack of mental responsibility or infirmity." As such, appellant has waived any claim based on R.C.M. 916(k)(2).

In sum, for all the reasons stated above, the military judge did not abuse his discretion in finding that the expert's testimony was not legally relevant under the *Houser* test.

## B. *Prior Consistent Statements*

### 1. *Additional Facts*

At the house immediately after the stabbing, both the victim and her neighbor testified that in response to appellant saying otherwise, the victim claimed she never pointed the gun at his face. On the other hand, two medical personnel who subsequently transported the victim to the hospital testified that the victim said she pointed the gun at appellant's face. In her first informal interview with law enforcement at the hospital, after learning that her children were in protective custody, the victim said she never pointed the gun at appellant. In a second recorded and more formal CID interview several days later, the victim again reiterated that she never pointed the gun at appellant's face, but further explained that she "flagged" him with the gun while turning towards the bed. About a month later, the victim initiated divorce proceedings in which she was seeking custody of the children. Finally, at trial the victim once again testified that she never pointed the gun directly at appellant, but rather "held it in the low ready position and never flagged [appellant] with it."

During both his opening statement and on cross-examination, defense counsel highlighted and questioned the victim about her inconsistent statements as to whether she pointed the gun at appellant. Although the bulk of cross-examination focused on the fact that the victim's story allegedly changed once she learned her children were in protective custody, counsel briefly touched on the divorce proceedings and the victim's desire to obtain custody of her children.

After the cross-examination, the government moved to admit Prosecution Exhibit (PE) 26 into evidence, containing two brief snippets from the second recorded CID interview wherein the victim stated she did not point the gun at appellant. The government sought to admit these prior consistent statements under both Mil. R. Evid. 801(d)(1)(B)(i) [(B)(i)] and 801(d)(1)(B)(ii) [(B)(ii)]. After reviewing the two snippets outside the presence of the panel in an Article 39(a) session, the military judge set forth the applicable standard, explained his analysis for the (B)(ii) prong, and admitted the statements as prior consistent statements under both the (B)(i) and B(ii) hearsay exceptions. The military judge, however, did not provide any analysis or explanation for his ruling that the statements were

admissible under the (B)(i) exception, nor did he analyze whether the prior consistent statements were admissible under Mil. R. Evid. 403.

## 2. *Law*

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019).

In *Frost*, the CAAF held that there were three "criteria" and two "guiding principles" governing the admission of a prior consistent statement under the (B)(i) hearsay exception. *Id.* at 109-10. With respect to the criteria: (1) the declarant must testify and be subject to cross-examination about the prior statement; (2) the prior statement must be consistent with the declarant's testimony; and (3) the statement must be offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in testifying. *Id.* at 110, citing Mil. R. Evid. 801(d)(1)(B)(i). In addition, (1) the prior statement must precede any motive to fabricate or improper influence it is offered to rebut, and (2) where multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut. *Id.* (citations omitted).

In *United States v. Finch*, the CAAF addressed the criteria for admission of a prior consistent statement under the (B)(ii) hearsay exception. 79 M.J. 389, 396 (C.A.A.F, 2019). In order for a statement to be admissible under this exception; (1) the declarant must testify; (2) the declarant must be subject to cross-examination; (3) the statement must be consistent with the declarant's testimony; (4) the declarant's testimony must be "attacked on another ground" other than the ones listed in (B)(i) [recent fabrication or recent improper influence or motive]; and (5) the prior consistent statement must actually be relevant to rehabilitate the witness's credibility on the basis on which she was attacked. *Id.* Although the rule itself does not specify what constitutes "other grounds," the CAAF noted that the Drafters' Analysis lists "charges of inconsistency or faulty memory" as two such examples. *Id.* at 395. The same Drafters' Analysis also states "to be admissible for rehabilitation, a prior consistent statement must satisfy the strictures of Rule 403." *Id.* Under either exception, the proponent of the prior consistent statement evidence bears the burden of demonstrating its admissibility. *Id.* at 394.

In *United States v. Ayala*, the CAAF noted that "[w]e made it clear in *Finch* that prior consistent statements may be eligible for admission under either (B)(i) or B(ii) but not both." 81 M.J. 25, 28 (C.A.A.F. 2021) (citing *Finch*, 79 M.J. at 396). First, the passage in *Finch* does not state that the two prongs are mutually exclusive, nor is there any other language in *Finch* reaching that holding. As such, a reasonable interpretation of the language in *Ayala* is that the CAAF was reiterating that the two prongs are separate and distinct, as opposed to foreclosing any scenario

in which a prior statement could be admissible under both exceptions if the criteria for each exception were individually satisfied. *See, e.g. United States v. Begay*, 116 F.4th 795, 801 n.2 (8th Cir. 2024) ("Only when a party impeaches a witness on a ground '[]other' than—*or in addition to*—a motive to lie does the second category kick in") (emphasis added) (citation omitted). Second, given that the CAAF in *Ayala* never actually reached the merits of the prior consistent hearsay exception rulings, but instead decided the case on a prejudice analysis, it is unclear whether the "holding" cited above is actually dicta. *See United States v. Flanner*, 85 M.J. 163, 174 (C.A.A.F. 2024) (holding that the military judge erred in relying on dicta from a prior CAAF opinion).

On the other hand, to the extent the CAAF in *Ayala* did in fact mean to hold that the two prior consistent hearsay exceptions are always mutually exclusive, we recognize that only the CAAF can overrule its own precedent, which we would respectfully urge it to do, or to at least provide more clarity on this issue. *See United States v. Tovarchavez*, 78 M.J. 458, 465 (C.A.A.F. 2019) ("[I]t is for this Court, not the ACCA, to overrule our precedent") (citations omitted); *United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996) (holding if a service level appellate court believes the underlying logic of one of the CAAF's decisions has changed, its recourse is "to express that viewpoint and to urge our reconsideration of our precedent"). In any event, as we describe below, because we find that the prior consistent statements were admissible under the (B)(ii) exception in this case, to the extent the military judge erred in admitting the statements under both exceptions, any such error was harmless.

### 3. Analysis

#### a. Admissibility under 801(d)(1)(B)(i)

Starting first with the (B)(i) analysis, both at trial and on appeal appellant argues that the motive to fabricate arose when the CID agent informed the victim at the first interview at the hospital that her children were in protective custody. According to appellant, the victim was worried that if she admitted to law enforcement that she had pointed the gun at appellant's face, she might not get her kids back, and therefore, she changed and fabricated her story during the second CID interview. The government counters that the second CID interview took place before the victim filed for divorce, wherein the victim had a motive to seek sole custody of her children. As such, the government argues that because the second CID interview preceded the divorce filing, any statements made during that interview were before the motive to fabricate.

We acknowledge that when there is an assertion of multiple motives to fabricate or multiple improper influences, the statement at issue need not precede all such motives or inferences, but only the one it is rebutting. On the other hand, we

question whether there were truly two separate motives to fabricate in this case. The "core" motivation at issue in this case appears to be a desire on the part of the victim to maintain custody of her children, either in response to their being placed in protective custody or as part of the divorce proceedings. Moreover, except for a few questions at the end of his cross-examination about the divorce, the focus of defense counsel's cross-examination was how the victim's story changed after she learned her children were in protective custody. Finally, and unfortunately, the military judge did not explain or provide any meaningful analysis of his (B)(i) ruling, and as noted above also failed to conduct an analysis under Mil. R. Evid. 403.

Given our holding below that the military judge properly admitted the statements under the (B)(ii) exception, however, we ultimately need not decide the propriety of his ruling admitting the same evidence under the (B)(i) exception.

### b. Admissibility under 801(d)(1)(B)(ii)

In both his opening statement and his cross-examination of the victim, defense counsel attacked the inconsistencies in the victim's prior statements pertaining to whether she pointed the gun at appellant. After reviewing the proffered statements outside the presence of the panel, the military judge analyzed all five factors set forth in *Finch*, and concluded that because the victim's prior statements made during the second CID interview were consistent with her trial testimony, and because the victim's testimony was attacked on "another ground" of "inconsistency attacks by defense counsel," the prior statements rehabilitated her trial testimony and were admissible under the (B)(ii) exception.

To the extent appellant argues that the CID interview is not consistent with the victim's trial testimony because the victim told CID she might have briefly "flagged" or inadvertently pointed the gun at appellant while she was turning towards the bed, we find this to be a distinction without a difference. Put another way, on the whole, the victim's statement to CID was consistent with her testimony at trial that she never intentionally pointed the gun in anger at appellant. *See United States v. Norwood*, 81 M.J. 12, 18 (C.A.A.F. 2021) (holding that the prior statement need not be identical in every detail to declarant's testimony at trial and that minor inconsistencies do not change the fact that the interview was for the most part consistent with the facts of central importance to the trial) (citations omitted).

While we recognize the CAAF has held that with respect to the (B)(i) exception "[s]tatements made after an improper influence arose do not rehabilitate a witness's credibility," *Frost*, 79 M.J. at 111, the same limitation does *not* automatically apply to prior consistent statements admitted under the (B)(ii) exception. To the contrary, in order to be admissible under (B)(ii), the declarant's testimony must be attacked on *another ground* than recent fabrication or improper influence or motive. As such, to the extent a declarant might make a prior consistent

10

statement *after* an alleged motive to fabricate that does not qualify for admission under (B)(i), nothing precludes a party from seeking admission of that same prior consistent statement under the (B)(ii) exception. *See United States v. Finch*, 78 M.J. 781, 787 (Army. Ct. Crim. App. 2019) (holding that while the timing of the prior consistent statement sought to be admitted under the (B)(ii) exception may be relevant when assessing its probative value, "[w]hen a prior consistent statement is offered under Mil. R. Evid. 801(d)(1)(B)(ii), the offering party does not have to per se show the timing of the prior statement"), *aff'd by* 79 M.J. 389 (C.A.A.F. 2020). As such, while we recognize that we may consider the timing of the statements in our (B)(ii) analysis, we reject appellant's argument that, because the victim made the statements at issue *after* she learned her children were in protective custody, the military judge erred in admitting the same statements under (B)(ii) that might not otherwise be admissible under (B)(i). This is especially true given that the statements at issue were also consistent with the victim's first report at the scene that she did not point the gun at appellant.

Citing *United States v. McCaskey* for the proposition that "mere repeated telling of the same story is not relevant," appellant further argues that it was error to admit the statements under the (B)(ii) exception. 30 M.J. 188, 192 (C.A.A.F. 1990). This argument, however, fails for several reasons. First, it ignores the fact that the victim did *not* merely retell the same story before trial and during her testimony. Second, appellant's "repeated telling" argument also ignores the fact trial defense counsel highlighted and attacked these inconsistencies from the outset when he asked the panel in his opening statement to pay close attention to whether the victim's testimony "in this courtroom [*is*] *consistent* with all of the other stories that she just told the EMT, the paramedic, medical professionals at IACH, CID?"

Finally, although the military judge failed to analyze admissibility under Mil. R. Evid. 403, after conducting such an analysis ourselves, we find that he did not abuse his discretion in admitting PE 26 containing the snippets of the victim's CID interview as a prior consistent statement under Mil. R. Evid. 801(d)(1)(B)(ii).[4]

---

[4] In its opposition, the government also offers a justification for the admission of PE 27, containing the victim's additional prior statements about the alleged strangulation. Because appellant, however, does not challenge the admission of PE 27, we decline to address that issue on appeal. *See, e.g.* Appellant's Opening Brief at p. 45 ("The government made Pros Ex. 26 which contains both statements at issue.").

### c. *Prejudice*

Even if the military judge erred in admitting the prior consistent statements, it would not change the ultimate outcome, as we conclude there was no prejudice. The government bears the burden of demonstrating harmlessness for preserved non-constitutional errors, specifically "whether the error had a substantial influence on the findings." *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019). In conducting this prejudice analysis, we weigh: (1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question. *Id.* With respect to the last two factors, we assess "how much the erroneously admitted evidence may have affected the court-martial." *United States v. Jones*, 85 M.J. 80, 85 (C.A.A.F. 2024) *citing United States v. Washington*, 80 M.J. 106, 111 (C.A.A.F. 2020).

With respect to the first two prongs of the *Kohlbek* test, we find that the government had the stronger case. Although the victim was inconsistent in her statements, it is significant that immediately after the assault, and before she had any idea of what would happen to her children, she denied pointing the gun at appellant's face. We also note that appellant's self-defense claim is undermined by his admissions that when he stabbed the victim the gun was already on the bed, and that he "thinks" the victim had already dropped the magazine. As to the last two factors, as the government correctly points out, the CID special agent testified at trial to most of the victim's prior consistent statements. *See Jones*, 80 M.J. at 85-86 (holding that when a fact is already obvious from other testimony at trial and the evidence in question "would not have provided any new ammunition," the erroneous admission of the evidence is likely to be harmless) (citations omitted). As such, we find that the materiality and quality of the snippets containing the victim's prior consistent statements to CID were of minimal value, especially when considered in the context of all of the testimony and evidence admitted at trial.

## CONCLUSION

Upon consideration of the entire record, the findings of guilty and the sentence are AFFIRMED.

Chief Judge POND and Judge JUETTEN concur.

FOR THE COURT:



// JAMES W. HERRING, JR.
Clerk of Court

12